1  JEFFREY M. COHON, ESQ. (CSBN 131431)
   Admitted Pro Hac Vice
2  **COHON & POLLAK, LLP**
   1999 Avenue of the Stars, Suite 1100
3  Los Angeles, California 90067
   Tel:    (310) 231-4470
4  Fax:    (310) 231-4610

5  Attorneys for Defendant and Counter Claimant
   The Land Holding Group, Inc.
6

7

8                     UNITED STATES BANKRUPTCY COURT

9                          DISTRICT OF NEVADA

10

11  IN RE THE LAND HOLDING GROUP, INC. )    CASE NO. BK-S-07-16852-BAM
                                        )
12          Debtor.                     )
                                        )
13  _____)
                                        )    Adv. Proceeding No. 2-08-01010-BAM
14  MOSHE GEDALIA, ET AL,               )
                                        )    **POST-TRIAL BRIEF OF DEFENDANT THE**
15          Plaintiffs,                 )    **LAND HOLDING GROUP, INC.**
            vs.                         )
16                                      )
    THE LAND HOLDING GROUP, INC., ET AL,)
17                                      )
                                        )
18          Defendants.                 )
    _____ _____   )
19

20

21        TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE AND TO THE

22  PARTIES AND THEIR ATTORNEYS OF RECORD:

23        Defendant and Counter-Claimant The Land Holding Group, Inc. presents the following Post-

24  Trial Brief in accordance with this Court's Order of October 2, 2009.

25  / /

26  / /

27  / /

28  / /

## TABLE OF CONTENTS

Page

I.   SUMMARY OF THE FACTS.................................................................2

    A.   The Mansions at Spanish Trails......................................................2

    B.   Santa Rita Acres Estates.................................................................3

    C.   The Litigation...................................................................................3

II.   REMAINING CLAIMS AND SUMMARY OF ARGUMENT.............................4

    A.   Gedalias' Complaint.........................................................................4

    B.   Land Holding's Counter Claims.......................................................5

III.   NEVADA'S CONFLICT OF LAWS RULES REQUIRES THE APPLICATION OF ARIZONA LAW TO THIS DISPUTE...................................................................6

IV.   THE GEDALIAS' COMPLAINT........................................................................7

    A.   The Gedalias Have No Standing To Assert Any Claims Against Land Holding Based Upon The Alleged Diversion of Funds By ITC Homes, Inc. Or Ron Amiran............. 7

    B   The Gedalias Have No Claim for Violations of Nevada's RICO Statutes.................10

        1.   The Application of Arizona Law Necessarily Precludes the Application of the Arizona RICO Statute...................................................................10

        2.   Plaintiffs' RICO Claim Is A Disguised Claim for Breach of Contact For Which RICO is Not a Proper Basis for Liability.............................................10

        3.   There Is No Liability For Any Substantive Claims Under The Nevada RICO Statutes..................................................................................................11

    C.   Fraud................................................................................................15

    D.   Unjust Enrichment...........................................................................17

    E.   Plaintiffs' Arguments Are Against ITC Homes, Inc. and Ron Amiran, Not The Land Holding Group, Inc., and Are The Subject of A Full and Complete General Release..............................................................................................18

V.   LAND HOLDING'S COUNTER COMPLAINT..................................................21

    A.   Intentional Interference with Prospective Economic Advantage...............21

B.    Abuse of Process ......................................................................................23

C.    Quiet Title...............................................................................................25

Cohon & Pollak,
LLP

**POST-TRIAL BRIEF**

I.      SUMMARY OF THE FACTS

      A.      The Mansions at Spanish Trails

It is undisputed that in 2005, the Arizona real estate market was sizzling.  In particular, real estate development in Tucson was especially lucrative.   Hence, two friends, David Melamed and Shawn Manshoory looked to Mr. Melamed's friend, Ron Amiran to offer them advice about developing a small parcel of property in the Tucson Arizona area, where Mr. Amiran had been living and working.

At the time, Mr. Amiran was the Managing Director of a real estate development company in Tucson called ITC Homes, Inc.  Mr. Amiran suggested that he would look for an opportunity and let Messrs. Melamed and Manshoory know if one might be available.  In early 2005, Mr. Amiran found a real estate development opportunity in Tucson.  Specifically, Mr. Amiran discovered a 51 acre parcel of undeveloped land, which had already been pre-approved for subdivision and construction permits for thirteen (13) luxury homes.

Messrs. Melamed and Manshoory were interested.   In October 2005, the Debtor, The Land Holding Group, Inc. paid $1,600,000 and bought the 51 acre parcel of undeveloped property in Tucson, Arizona with the intent to develop thirteen (13) high-end homes. Of the $1,600,000 paid by The Land Holding Group, the first $800,000 was contributed by the shareholders, David Melamed, Shawn Manshoory and Jacob Bachar.  The remaining $800,000 was borrowed from Tuesday Investments, Inc., a creditor in these proceedings.  As reflected in the HUD-1 Settlement Statement, no money from ITC Homes or the Gedalias were used to acquire the land for the project which was to be known as The Mansions at Spanish Trails. (Exhibit 34.)

Land Holding engaged the services of Mr. Amiran and his company, ITC Homes to assist in developing the property.   Mr. Amiran also assisted Land Holding in securing construction financing for the property from First National Bank of Arizona (""FNBA"") in Tucson.  On or about September 7, 2005, FNBA committed to loan Land Holding approximately $5.5 million in construction financing. (Exhibits 21 and 22.)  By all accounts, the Spanish Trails project was on its way to a successful development.

/ / /

B.    <u>Santa Rita Acres Estates</u>

Two years earlier, in or about 2003, Ron Amiran and his company, ITC Homes, agreed with the Gedalias and their company, M&S Unlimited (collectively "Gedalias"), to develop mid-range homes on raw land in Vail Arizona, approximately 20 miles from the Spanish Trails project. The ITC Homes/Gedalia project was known as Santa Rita Acres Estates. The Spanish Trails project was just starting when Santa Rita Acres Estates was well along its development, having constructed and sold dozens of homes. Partial financing for the Santa Rita Acres Estates project came from FNBA — the same lender on the Spanish Trails project.  Santa Rita Acres Estates and the Gedalias had nothing to do with Spanish Trails.  The only common element was ITC Homes and Ron Amiran, the developer of both projects.

C.    <u>The Litigation</u>

In October 2005, the Gedalias and Amiran, on behalf of ITC Homes, met to reconcile the amounts due to/from ITC Homes and the Gedalias. Unable to resolve their differences, on November 14, 2005, the Gedalias filed a multi count lawsuit in the Nevada State Court against ITC Homes, Inc., ITC Financial Services, Inc., Ron Amiran, Sue Ellen Amiran, Doron Amiran, Sterling Realty Investment, Inc. fdba Mesonic America, Inc., Regency Consulting, Inc., The Land Holding Group, Inc., and Title Security of Arizona Trust #814.  Specifically, the Gedalias claimed that ITC Homes and Amiran failed to pay them the money they were owed in accordance with a series of contracts.  The Gedalias also claimed that Land Holding was a fictitious entity used by ITC Homes and Amiran to divert money from the Santa Rita Acres Estates project to develop Land Holding's Spanish Trails project in Tucson.  The evidence was (and is) to the contrary and the Gedalias knew it.

In November, 2005, and just after they filed their lawsuit, Moshe Gedalia and Suzie Gedalia flew from Los Angeles to Tucson, Arizona and met with Chip Shaw and other officers of FNBA and told them that the members of Land Holding were dishonest and that they should not be trusted. The Gedalias also told the FNBA bank officials that Land Holding had money that belonged to them from ITC Homes and that, even though the Gedalias had no interest in the Spanish Trails project, **FNBA should immediately cancel the construction financing to Land Holding**. Based upon the Gedalias' untruthful and defamatory remarks and the allegations of their lawsuit against Land Holding, FNBA

Cohon & Pollak,
LLP

did as the Gedalias suggested and cancelled the loan commitment — **even though the statements made by the Gedalias were later shown to be verifiably untrue**. Regrettably, Land Holding could not obtain any alternative financing and the Spanish Trails project failed.

Also as a result of the Gedalias' lawsuit, ITC Homes was forced into bankruptcy in Tucson, Arizona. That case was assigned to the Honorable Eileen Hollowell. During the course of that proceeding, Judge Hollowell ordered an independent audit of the use of ITC Homes' funds. The Court appointed Christopher Linscott, a CPA with Keegan, Linscott and Kenon, P.C. to perform the audit. **Mr. Linscott found that the Gedalias' allegations as to Land Holding were baseless**. The ITC Homes bankruptcy case has been resolved, and all claims between the Gedalias, Amiran and ITC Homes have been settled and released. The claims between the Gedalias and Land Holding remained unresolved.

According to the expert report prepared by Land Holdings' retained forensic expert, the Gedalias caused damages to Land Holding in an amount not less than **$4,903,446**.   This does not include punitive and exemplary damages that should  be awarded to Land Holding.

## II.      REMAINING CLAIMS AND SUMMARY OF ARGUMENT

### A.      Gedalias' Complaint

In their Complaint, the Gedalias have alleged claims for (1) Breach of Contracts; (2) Breach of Covenant of Good Faith and Fair Dealing; (3) RICO Pursuant to N.R.S. § 207.350 et seq.; (4) Injunctive Relief; (5) Receiver; (6) Negligence; (7) Equitable Esoppel; (8) Unjust Enrichment, (9)  Conversion and (10) Fraud.  Most of these claims were obviously asserted against the other defendants in this case, and were **not related to Land Holding**. Following Land Holding's motion to dismiss pursuant to FRCP, Rule 52©, made at the close of the plaintiffs' case in chief, this Court dismissed all of the Gedalias' claims except the third cause of action for violation of the Nevada RICO statutes, the eighth cause of action for unjust enrichment, and tenth cause of action for fraud.  These are the only claims that remain against Land Holding.

As the Court will recall, Land Holding filed a brief establishing that during an early deposition of Moshe Gedalia, counsel for the Gedalias went through the complaint and determined that only selected allegations in the **third cause of action for RICO** (paragraph 63D) and the **tenth cause of**

Cohon & Pollak,
LLP

1    **action for fraud** (paragraph 29H and 130)were being asserted against Land Holding.  (Deposition of

2    Moshe Gedalia taken on March 5, 2008 at 52:21 through 58:2.)  Based upon the agreement reached at

3    the deposition between Land Holding's attorney, Dan Waite of Lewis & Roca and the Gedalias'

4    counsel, Thomas Michaelides, the Mr. Gedalia was questioned only on the specified paragraphs in the

5    two causes of action remaining according to Mr. Michaelides.  (Deposition of Moshe Gedalia taken on

6    March 5, 2008 at 52:21 through 58:2.) At the conclusion of the attorneys' exchange on the record, Mr.

7    Michaelides agreed on the record that if he intended to resurrect any other causes against Land Holding,

8    that he would notify Land Holding so that it could re-depose Mr. Gedalia on those other causes of

9    action.  Neither the Gedalias nor Mr. Michaelides ever revived any of the other causes of action, and

10   therefore by stipulation, the only possible claims which can be asserted against Land Holding are the

11   selected provision in the **third cause of action for RICO** (paragraph 63D) and the **tenth cause of**

12   **action for fraud** (paragraph 29H and 130).  The eighth cause of action for unjust enrichment should

13   be summarily dismissed.  In any event, Land Holding contends that the Gedalias' claims for RICO,

14   unjust enrichment and fraud are baseless.

15          **B.     Land Holding's Counter Claims**

16          In their Counter-Complaint, Land Holding has alleged seventeen causes of action against the

17   Gedalias based on the facts set forth above: (1) Violation of the Federal RICO statutes, (2) Breach of

18   Contract, (3) Breach of the Covenant of Good Faith and Fair Dealing, (4) Breach of Fiduciary Duties,

19   (5) Conspiracy, (6) Intentional Misrepresentation, (7) Negligent Misrepresentation, (8) Abuse of

20   Process, (9) Intentional Interference with Contractual Relations, (10) Intentional Interference with

21   Prospective Economic Advantage, (11) Unjust Enrichment, (12) Receivership, (13) Indemnity, (14)

22   Contribution, (15) Conversion, (16) Misappropriation of Trade Secrets, and (17) Quiet Title.  **At this**

23   **juncture in the proceedings, Land Holding is focusing on four (4) of those claims against the**

24   **Gedalias: (1) Abuse of Process, (2) Intentional Interference with Prospective Economic**

25   **Advantage, and (3) Quiet Title.**  Land Holding has plead a conspiracy claim.  "While Arizona does

26   not recognize a civil action for conspiracy, it does recognize 'an action for damages caused by acts

27   committed pursuant to a conspiracy.'" *Wojtunik v. Kealy,* 394 F.Supp.2d 1149 (D.Ariz.2005). Under

28   Arizona law, for a conspiracy action to lie, "two or more people must agree to accomplish an unlawful

Cohon & Pollak,
LLP

purpose or to accomplish a lawful object by unlawful means, causing damages." *Wells Fargo Bank v. Arizona Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 38 P.3d 12, 36 (2002); *Rowland,* 157 Ariz. at 306, 757 P.2d at 110. Land Holding relies on its conspiracy allegation to establish liability against the various cross-defendants.

**III.     NEVADA'S CONFLICT OF LAWS RULES REQUIRES THE APPLICATION OF ARIZONA LAW TO THIS DISPUTE**

The United States Supreme Court has held that federal courts sitting in diversity jurisdiction must apply the conflict-of-law rules prevailing in the states in which they sit. *Klaxon Co. v. Stentor Elec. Mfg. Co.* (1941) 313 U.S. 487, 496-97, 61 S.Ct. 1020, 85 L.Ed. 1477. The Ninth Circuit follows the same rule. *Patton v. Cox* (9th Cir. 2002) 276 F.3d 493, 495 ["Federal courts sitting in diversity must apply 'the forum state's choice of law rules to determine the controlling substantive law.'"] Indeed, United States Bankruptcy Courts apply the same rule. *Mann v. GTCR Golder Rauner, LLC* (D.Ariz. 2006) 351 B.R. 685, 694. Accordingly, this Court must apply Nevada's conflict-of-law rules.

In 2006, the Nevada Supreme Court, sitting *en banc*, adopted the "most significant relationship test" set forth in Section 145 of the Restatement (Second) on Conflicts of Laws when addressing conflict of laws issues, primarily in tort claims. *General Motors Corporation v. Eighth Judicial District Court of the State of Nevada* (2006) 122 Nev. 466, 473. "We take this opportunity to clarify Nevada's choice-of-law jurisprudence and hold that the Second Restatement's most significant relationship test governs choice-of-law issues in tort actions unless another, more specific section of the Second Restatement applies to the particular tort." *General Motors* at 473. "The rights and liabilities of parties with respect to an issue in tort are governed by the local law of the state that, 'with respect to that issue, has the most significant relationship to the occurrence and the parties . . . ." *General Motors* at 474.

"When the injury occurred in a single, clearly ascertainable state and when the conduct which causes the injury also occurred there, that state will usually be the state of the applicable law with respect to most issues involving the tort." Rest 2d Conflicts, §145, comment e. In tort cases involving abuse of process and the misuse of judicial proceedings, the place of injury is particularly important. Rest 2d Conflicts, §145, comment f; See also Rest. 2d Conflicts, § 155. Similarly, the local law of the

1    state where a defamatory publication occurred will govern the resolution of such disputes.  Rest 2d

2    Conflicts, §145, comment e, See also, Rest. 2d Conflicts, § 149.

3    In the instant case, the Gedalias' claims involve alleged violations of the Nevada RICO statutes,

4    fraud and unjust enrichment.  At least as to Land Holding, the plaintiff alleges that the alleged

5    misconduct, if any, occurred in the State of Arizona.  (Complaint, ¶s 63(d), 115 – 120, and 129(h).)

6    There are no allegations of any misconduct involving Land Holding occurring in the State of Nevada.

7    To the extent that the Gedalias complain about the alleged actions of Ron Amiran, even by their own

8    admission no conduct occurred outside the State of Arizona.  In like manner, the gravamen of the

9    counter claims involve the Gedalias' misuse of a judicial proceeding, originally filed in Nevada but

10   misused in Arizona, when presented to officials at First National Bank of Arizona.  The Gedalias'

11   interference and related publications took place in Arizona when they flew there from Los Angeles and

12   met with the bank officials to stop the loan to Land Holding.  Finally, the land at issue was all in

13   Arizona, not in Nevada.  In light of the Land Holding's quiet title action, the application of Arizona law

14   is proper for the resolution of that claim.  Because the entire relationship between the parties in this case

15   is centered in Arizona, the properties and projects at issue are located in Arizona, and the injuries

16   alleged in the Complaint and Counter-Complaint purportedly arose out of conduct that occurred in

17   Arizona, it follows that Arizona has the most significant relationship to the allegations of this case, and

18   therefore, the substantive laws of the State of Arizona must apply to the claims herein.

19   **IV.     THE GEDALIAS' COMPLAINT**

20   A.     The Gedalias Have No Standing To Assert Any Claims Against Land Holding Based

21   Upon The Alleged Diversion of Funds By ITC Homes, Inc. Or Ron Amiran.

22   The ostensible basis of the Gedalias' claims against Land Holding is simple.  As summarized

23   by the Gedalias' counsel in his opening statement, "The Gedalias brought this case to try and get back

24   money and property that they believed . . . was **wrongfully taken by Ron Amiran**.  Some of that

25   property included land owned by Land Holdings [sic] that was bought with misappropriated moneys.

26   [¶] We will show that Land Holdings [sic] before and around the time the lawsuit was filed was a side

27   company formed by Ron Amiran **with money he had wrongfully taken from ITC**." (Trial Transcript,

28   9/17/2009 at 10:16-23.)  [T]he lawsuit was filed against ITC, Ron Amiran, his wife, his son, and Land

Holdings [sic] because that was one of the side companies which Mr. Amiran used to purchase **with money from ITC that was wrongfully taken**."    (Trial Transcript, 9/17/2009 at 11:2-6.)  "You'll notice the chart to my right.  We have placed the following facts on a time line to reveal how **Amiran used ITC to quietly acquire land in Arizona for his benefit using ITC capital** . . . ."    (Trial Transcript, 9/17/2009 at 13:23-14:1.)  Ron took "advantage of his increased access to the ITC funds."    (Trial Transcript, 9/17/2009 at 16:14-15.)  "Amiran very quietly forms other side companies and invoices [ITC] for smaller, less noticeable amounts.  **These proceeds** all went to start the side companies, including Land Holdings [sic] which purchased the land at Spanish Trail."    (Trial Transcript, 9/17/2009 at 16:19-23.)    Amiran "used the money that I had previously stated was **withdrawn from ITC** . . . ."    (Trial Transcript, 9/17/2009 at 17:4-5.)  The fact that Amiran was improperly **siphoning off money from ITC** for the benefit of the companies he had formed later provided the reason why the Gedalias were justified in filing their lawsuit . . . ."    (Trial Transcript, 9/17/2009 at 17:14-17.)  There are dozens of additional examples of the Gedalias' legal platitudes in which they repeatedly advance their (false) belief that Ron Amiran unlawfully used **ITC money** to acquire a stake in Land Holding or in the property at Spanish Trails.  Indeed, Moshe Gedalia's own sworn testimony (given through a Hebrew interpreter) is that he has no idea if Ron Amiran or ITC Homes ever gave any money to Land Holding.  (Trial Testimony of Moshe Gedalia dated 9/30/2009 at 15:18 through 16:16.)  Even if that were the case, however, the Gedalias have no standing to bring any claims against Land Holding.

The Supreme Court of Arizona has held that to establish standing, the plaintiffs must establish show a particularized injury to themselves.  *Fernandez v. Takata Seat Belts, Inc.* (2005) 210 Ariz. 138, 140; *Bennett v. Napolitano* (2003) 206 Ariz. 520, 524.  In *Sears v. Hull* (1998) 192 Ariz. 65, plaintiffs' remote and generalized claim showed no distinct and palpable injury to plaintiffs themselves and did not allege harm of the nature required to achieve standing.  Moreover, the standing doctrine is consistent with notions of judicial restraint and ensures that courts refrain from issuing advisory opinions, that cases be ripe for decision and not moot, and that issues be fully developed between true adversaries. *See Armory Park Neighborhood Ass'n v. Episcopal Cmty. Servs. in Ariz.,* (1985) 148 Ariz. 1, 6.

/ / /

Cohon & Pollak,
LLP

1    Even if any of the plaintiffs were shareholders in ITC Homes, which they are not, they have no

2    standing to assert direct claims against Land Holding. *Sparling v. Hoffman Constr. Co.*, 864 F.2d 635,

3    640 (9th Cir.1988) [even if individual shareholders have stated a cause of action to assert a federal

4    RICO claim, they have no standing to sue where the harm is based on injuries to the corporation.]

5    It is an immutable fact that Moshe Gedalia was not a shareholder, officer or director of ITC

6    Homes, Inc. (Trial Testimony of Ron Amiran dated 10/1/2009 at 128:7-13; Trial Testimony of Moshe

7    Gedalia dated 9/30/2009 at 74:18-23.)    Moshe Gedalia was never an employee or manager of ITC

8    Homes. (Trial Testimony of Moshe Gedalia dated 9/30/2009 at 74:24 to 75:15.)  Moshe Gedalia was

9    not involved in the formation or the legalities in creating ITC Homes. (Trial Testimony of Moshe

10    Gedalia dated 9/30/2009 at 76:6-16.)  No shares in ITC were ever issued to Moshe Gedalia, and he

11    never attended any shareholder or director meetings of ITC Homes. (Trial Testimony of Moshe Gedalia

12    dated 9/30/2009 at 76:16 through 77:1.)  Additionally, Moshe Gedalia had no signature authority on any

13    of ITC Homes' bank accounts. (Trial Testimony of Moshe Gedalia dated 9/30/2009 at 77:2-20.)  Put

14    simply, Moshe Gedalia had no relationship with ITC Homes, except that his company, M&S Unlimited,

15    LLC had two contracts with ITC Homes to build homes on vacant lots – no more, no less. (Trial

16    Testimony of Moshe Gedalia dated 9/30/2009 at 121:24-25.)

17    In like manner, Moshe Gedalia is a stranger to Land Holding.  Moshe Gedalia was never a

18    shareholder, officer or director of Land Holding. (Trial Testimony of Moshe Gedalia dated 9/30/2009

19    at 14:2-15.) Mr. Gedalia has never attended any corporate meetings of Land Holding. (Trial Testimony

20    of Moshe Gedalia dated 9/30/2009 at 14:16-18.) Mr. Gedalia has never seen the books and records for

21    Land Holding, including its bank statements, check registers, financial statements and balance sheets.

22    (Trial Testimony of Moshe Gedalia dated 9/30/2009 at 14:19 through 15:8.)  Mr. Gedalia has no

23    relationship whatsoever with Land Holding that would give him a recognized basis upon which to sue

24    the company for alleged transfers of funds from ITC Homes to Land Holding.  The Gedalias could (and

25    did) sue ITC Homes and Ron Amiran if he believed that there were any contractual or tortious activities.

26    Distilled to its essence, the Gedalias argue that Ron Amiran used ITC Homes money to fund the

27    formation of other entities, and in particular, Land Holding.  The Gedalias similarly contend (without

28    support) that Amiran acquired land in Arizona using ITC Homes capital.  Even if these contentions had

any merit, the Gedalias have no standing to pursue such claims; they would belong solely to ITC Homes and its shareholders.  If ITC Homes breached any of the agreements with the Gedalias, then the Gedalias could pursue a claim for breach of contract or fraud in the inducement of such agreements.  However, on this record, the Gedalias cannot assert claims against Land Holding for the perceived sins of Mr. Amiran.  Otherwise, any person in a business relationship with another person could instantly sue any persons with whom his adversary has done business.  The in terrorem effect of such a rule would be shocking, just as it in this case.

        B.     The Gedalias Have No Claim for Violations of Nevada's RICO Statutes

            1.     The Application of Arizona Law Necessarily Precludes the Application of the Arizona RICO Statute.

In their Complaint, the Gedalias allege that Land Holding violated the *Nevada RICO statutes*. Because the laws of the State of Arizona apply to this lawsuit, and because plaintiffs' claims are based solely upon Nevada law and not Arizona law, the Gedalias' cause of action for violation of the Nevada RICO statutes must fail in its entirety.

            2.     Plaintiffs' RICO Claim Is A Disguised Claim For Breach Of Contact For Which RICO Is Not A Proper Basis For Liability.

In *G.K. Las Vegas Limited Partnership v. Simon Property Group*, 460 F.Supp.2d 1222, 1235 (D.Nev. 2006) the District Court of Nevada concluded that the Nevada RICO statutes do not recognize a cause of action where the alleged defalcation arises from the use of funds inconsistent with a contract. *Id* at 1237.  "The Court agrees with the analysis in *Rodrigues,* in which the Ninth Circuit stated that 'if a party committed theft every time it failed to pay, or failed to cause another to pay, money when due, RICO law would swallow up much of the common law of contracts.' [Citation]."  See also, *United States v. Rodrigues*, 159 F.3d 439 (9th Cir.1998); *Annulli v. Panikkar,* 200 F.3d 189, 199-200 (3d Cir.2000), abrogated on other grounds, 228 F.3d 471 (3d Cir.2000).  To find otherwise would undermine the legislature's ability to deter certain specified acts through the RICO framework simply because the underlying acts would also constitute a breach of contract.  *GK Vegas, supra,* at 1236.

A plaintiff cannot state a claim under the RICO statute by artfully pleading what is essentially a breach of contract claim. *Rodrigues*, 159 F.3d at 448. Therefore, in determining whether a plaintiff

has failed to adequately allege the requisite underlying acts to sustain a claim for RICO, the Court must initially assess whether plaintiff's alleged offenses are simply standard breach of contract claims dressed as a predicate act before moving to the underlying merits. See *Yerington Ford, Inc. v. GMAC*, 359 F.Supp.2d 1075, 1082-83 (D.Nev.2004).

Here, plaintiffs aver that four transactions give rise to the alleged racketeering activities. (Complaint, ¶ 63.)  Plaintiff's counsel has previously represented that only the fourth transaction is alleged to include  Land Holding. See, Section II(A), *supra.*  Notably, the first two transactions are precisely the kind of claims barred by *GK Vegas* and *Rodrigues* as they assert "the failure to tender the Plaintiffs the monies due and owing to them pursuant to said agreements." (Complaint ¶ 63(a) and (b).) The third clearly does not relate to The Land Holding Group as it involves allegations that Ron Amiran altered the designation of real property parcels on a trust agreement relating to Santa Rita Acres Estates. Like the first and second transactions, however, the fourth transaction also fits squarely into the kind of transaction barred by *GK Vegas* and *Rodrigues*.  The fourth allegation states that "Defendants, having failed to pay the monies due and owing to Plaintiffs **in accordance with said agreements**, . . . ." (Bold added) (Complaint, ¶63(d).)  This court must dismiss the RICO claim as it cannot be recognized as a RICO violation because it is nothing more than an artfully plead breach of contract claim.  Moreover, since there were no agreements between any of the plaintiffs and Land Holding, the factual predicate for this claim is non-existent.  (Trial Testimony of Moshe Gedalia dated 9/30/2009 at 32:18 through 33:18.)

>    3.    There Is No Liability For Any Substantive Claims Under The Nevada RICO
>           Statutes.

Nevada's anti-racketeering statutes, NRS 207.350 through NRS 207.520, inclusive, were enacted in 1983 and are patterned after the federal Racketeer Influenced and Corrupt Organizations, or "RICO," statutes, 18 U.S.C. §§ 1961- 1968. Like their federal counterparts, Nevada's anti-racketeering statutes provide for a civil cause of action for injuries resulting from racketeering activities under which a plaintiff may recover treble damages, attorney's fees and litigation costs. See NRS 207.470; *Hale v. Burkhardt* (1988) 104 Nev. 632, 634, 764 P.2d 866, 867.

/ / /

Cohon & Pollak,
LLP

NRS 207.470 states in part that: "Any person who is injured in his business or property by reason of any violation of NRS 207.400 has a cause of action against a person causing such injury for three times the actual damages sustained."  For starters, the plaintiffs cannot bring a claim under the Nevada RICO statutes for the simple reason that they have not been injured in *their business or property* through any alleged violation of the BRS 207.400 by Land Holding.  It is an iron clad fact that ITC Homes is not plaintiffs' business or property.

Pursuant to NRS 207.470 and NRS 207.400, a civil RICO cause of action is based upon allegations and proof that the defendants engag[ed] in ***at least two crimes*** related to racketeering that have the same or similar pattern, intents, results, accomplices, victims or methods of commission, or are otherwise interrelated by distinguishing characteristics and are not isolated incidents, if at least one of the incidents occurred after July 1, 1983, and the last of the incidents occurred within 5 years after a prior commission of a crime related to racketeering. *Hale v. Burkhardt, supra*, 104 Nev. at 634-635, 764 P.2d at 867.  NRS 207.390 states that "Crimes related to racketeering" are enumerated in NRS 207.360.  In their Complaint, the plaintiffs specify four sections (or crimes) which allegedly give rise to their Nevada RICO claim – none of which have any application to Defendant Land Holding Group.

(a)    Violation of N.R.S. §207.360(9), taking property from another under circumstances not amounting to robbery. (Complaint, ¶ 61(a).)  The alleged taking, if any, is identified in paragraph 63(d) of the Complaint.  That paragraph, which piggy-backs on the preceding three subparagraphs, refer to the Phase I and II contracts between ITC Homes and M&S Unlimited for the development of the Santa Rita Acres Estates Project. (Complaint, ¶ 63.)  Here, it is undisputed that The Land Holding Group was not involved in any aspect of the Santa Rita Acres Estates Project.  Moreover, Land Holding was not a party to any contracts with the plaintiffs.  (Trial Testimony of Moshe Gedalia dated 9/30/2009 at 32:18 through 33:18.)   Plaintiffs contend only that Ron Amiran and ITC Homes used its money to form Land Holding and to acquire real property in Arizona.  There is no evidence that Land Holding "took" any property from the plaintiffs, much less Amiran or ITC Homes.  As such, Land Holding did not "take" any property from any of the Plaintiffs as alleged in the first prong of the Nevada RICO cause of action.

/ / /

Cohon & Pollak, LLP

(b)      <u>Violation of N.R.S. §207.360(16), grand larceny</u>. N.R.S. § 205.220 defines grand larceny. That section provides: "Except as otherwise provided in NRS 205.226 and 205.228, a person commits grand larceny if the person:

1. Intentionally steals, takes and carries away, leads away or drives away:

(a) Personal goods or property, with a value of $250 or more, owned by another person;

(b) Bedding, furniture or other property, with a value of $250 or more, which the person, as a lodger, is to use in or with his lodging and which is owned by another person; or

© Real property, with a value of $250 or more, that the person has converted into personal property by severing it from real property owned by another person.

2. Uses a card or other device for automatically withdrawing or transferring money in a financial institution to obtain intentionally money to which he knows he is not entitled.

3. Intentionally steals, takes and carries away, leads away, drives away or entices away:

(a) One or more head of livestock owned by another person; or

(b) One or more domesticated animals or domesticated birds, with an aggregate value of $250 or more, owned by another person.

4. With the intent to defraud, steal, appropriate or prevent identification:

(a) Marks or brands, causes to be marked or branded, alters or defaces a mark or brand, or causes to be altered or defaced a mark or brand upon one or more head of livestock owned by another person;

(b) Sells or purchases the hide or carcass of one or more head of livestock owned by another person that has had a mark or brand cut out or obliterated;

© Kills one or more head of livestock owned by another person but running at large, whether or not the livestock is marked or branded; or

(d) Kills one or more domesticated animals or domesticated birds, with an aggregate

Cohon & Pollak, LLP

1    value of $250 or more, owned by another person but running at large, whether or not the

2    animals or birds are marked or branded.

3

4    There is no evidence that Land Holding "intentionally stole, drove or carried away" any personal

5    or real property, with a value of $250 or more, which Land Holding "converted into personal property

6    by severing it from real property owned by another person." There is no evidence that Land Holding

7    committed grand larceny.

8    ©    Violation of NRS. §207.360(25), embezzlement of money or property valued at

9    $250 or more. The Nevada crime of embezzlement is found at N.R.S. §205.300. That section defines

10    the offense of embezzlement as follows.

11

12    "Any bailee of any money, goods or property, who converts it to his own use, with the

13    intent to steal it or to defraud the owner or owners thereof and any agent, manager or

14    clerk of any person, corporation, association or partnership, or any person with whom

15    any money, property or effects have been deposited or entrusted, who uses or

16    appropriates the money, property or effects or any part thereof in any manner or for any

17    other purpose than that for which they were deposited or entrusted, is guilty of

18    embezzlement, and shall be punished in the manner prescribed by law for the stealing

19    or larceny of property of the kind and name of the money, goods, property or effects so

20    taken, converted, stolen, used or appropriated."

21

22    Initially, the crime of embezzlement requires "conversion." This Court dismissed the plaintiff's

23    conversion count in response to Land Holding's motion under FRCP, Rule 52©.

24    Moreover, "the key distinguishing element of the crime of embezzlement is the element of

25    entrustment. In order to be guilty of embezzlement, a defendant must have been entrusted with lawful

26    possession of the property prior to its conversion." *Batin v. State* (2002) 118 Nev. 61, 65. There is no

27    evidence that plaintiff's "entrusted" any property to Land Holding, which could in turn be converted.

28    The absence of an act of entrustment by the plaintiffs toward Land Holding makes a finding of

Cohon & Pollak,
LLP

14

1    embezzlement impossible.

2        Finally, there is no evidence that Land Holding acquired any property of the plaintiffs under any

3    circumstances.

4            (d)    Violation of N.R.S. §207.360(26), obtaining possession of money or property

5    valued at $250 or more, or obtaining a signature by means of false pretenses.  Stated differently, the

6    defendant must have used false pretenses to obtain money or property.  *Stoddart v. Miller* (Nev. 2008)

7    2008 WL 6070835 at 6.  The elements of the crime of obtaining something of value by false pretenses

8    are: (1) intent to defraud; (2) a false representation; (3) reliance on the false representation; and (4) that

9    the victim be defrauded.  *Hale v. Burkhardt* (1988) 104 Nev. 632, 639.

10        First, there is no evidence that Land Holding obtained possession of plaintiff's property or

11    money.  Second, there is no evidence that Land Holding made any false pretense to any of the plaintiffs.

12    Indeed, the evidence shows that Land Holding made no representations to any of the plaintiffs, and

13    therefore, could have made no false representations.  (Trial Testimony of Moshe Gedalia dated

14    9/30/2009 at 34:6 through 35:15.)  Moshe Gedalia had no conversations with David Melamed except

15    about settlement.  (Trial Testimony of Moshe Gedalia dated 9/30/2009 at 23:21 through 25:2.)  There

16    is no evidence that plaintiff's relied upon any representations of any kind made to them by Land

17    Holding.  Moreover, there is no evidence before this Court of any intent to defraud any plaintiffs by

18    Land Holding.  And, of course, there is no evidence that any plaintiffs were the victim of any fraud by

19    Land Holding.

20        C.    Fraud

21        In Arizona, there are nine essential elements of a fraud cause of action: (1) A representation; (2)

22    its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his

23    intent that it should be acted upon by the person and in the manner reasonably contemplated; (6) the

24    hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; (9) his

25    consequent and proximate injury. *Moore v. Meyers* (1927) 31 Ariz. 347, 253 P. 626. It is fundamental

26    in this jurisdiction that 'there can be no actionable fraud without a concurrence of *all* the elements

27    thereof.' *Wilson v. Byrd* (1955) 79 Ariz. 302, 304, 288 P.2d 1079, 1081. (Emphasis in original.) While

28    a direct affirmative allegation of all essentials of fraud is not necessary, *Wood v. Ford* (1937) 50 Ariz.

Cohon & Pollak,
LLP

356, 72 P.2d 423, a failure to prove any one of the elements would be fatal to any case sounding in fraud. Indeed, the proof must be clear and convincing, particularly where, as here, the parties are dealing at arms length and no confidential or fiduciary relationship exists. *In re McDonnell's Estate* (1947) 65 Ariz. 248, 179 P.2d 238. "Fraud may never be established by doubtful, vague, speculative, or inconclusive evidence." *Echols v. Beauty Built Homes, Inc.* (1982) 132 Ariz. 498, 500.

(a)     The Land Holding Group, Inc.  made no representations to any of the plaintiffs.

None of the three principals of The Land Holding Group, Inc. made any representations to Moshe Gedalia. Except to discuss settlement (after the lawsuit was filed) David Melamed never made any representations to Moshe Gedalia. (Trial Testimony of Moshe Gedalia dated 9/30/2009 at 23:21 through 25:2.) Shawn Manshoori never made any representations to Moshe Gedalia. Jacob Bachar never made any representations to Moshe Gedalia. (Trial Testimony of Moshe Gedalia dated 9/30/2009 at 34:20-22.)   Land Holding made no representations to Moshe Gedalia, much less any misrepresentations.

Since Suzie Gedalia did not testify, there is no evidence that any of the principals of The Land Holding Group, Inc. made any representations to Suzie Gedalia.  In like manner, none of the three principals of Land Holding made any representations to Isaac Gedalia, and therefore, Land Holding made no representations to Isaac Gedalia.

If no representations were made to Suzie Gedalia, Moshe Gedalia or Isaac Gedalia, then no representations were made to M&S Unlimited, LLC. The absence of any representations must end the analysis here, since all of the remaining elements assume the presence of representations by the defendants to the plaintiffs.

(b)     There were no false representations to any plaintiffs.

If The Land Holding Group, Inc. or its principals made no representations to any of the plaintiffs, then no false representations were made to the plaintiffs.

(c)     There were no material misrepresentations.

If The Land Holding Group, Inc. or its principals made no representations to any of the plaintiffs, then no material representations were made to the plaintiffs.

/ / /

Cohon & Pollak,
LLP

1        (d)    <u>The speaker's knowledge of its falsity or ignorance of its truth.</u>

2        If The Land Holding Group, Inc. or its principals made no representations to any of the

3    plaintiffs, then it follows that it could not have had knowledge of the falsity of any such representations.

4        (e)    <u>The Land Holding Group, Inc. had no intent that it should be acted upon by the</u>

5        <u>person and in the manner reasonably contemplated</u>

6        If the Land Holding Group, Inc. or its principals made no representations to any of the plaintiffs,

7    then it could not have had any intent that any such non-representations should be acted upon by the

8    plaintiffs in any way.

9        (f)    <u>The hearer's ignorance of its falsity</u>

10        If the Land Holding Group, Inc. or its principals made no representations to any of the plaintiffs,

11    then it follows that there could be no evidence of the hearer's ignorance of any non-representations.

12        (g)    <u>Plaintiffs reliance on its truth</u>

13        Again, If the Land Holding Group, Inc. or its principals made no representations to any of the

14    plaintiffs, then it follows that there could be no reliance on any non-representations.

15        (h)    <u>Plaintiff's right to rely thereon;</u>

16        If the Land Holding Group, Inc. or its principals made no representations to any of the plaintiffs,

17    then it follows that there could be no reliance or a right to rely on any non-representations.

18        (I)    <u>Plaintiff's consequent and proximate injury</u>

19        If the Land Holding Group, Inc. or its principals made no representations to any of the plaintiffs,

20    then it follows that there are no damages.  Indeed, Moshe Gedalia testified that The Land Holding

21    Group, Inc. does not owe him or any of the plaintiffs any money.  (Trial Testimony of Moshe Gedalia

22    dated 9/30/2009 at 33:19-24.)  Plaintiffs have presented no evidence of damages proximately caused

23    by defendant Land Holding.

24        D.    <u>Unjust Enrichment</u>

25        Under Arizona law, unjust enrichment is based on five elements: (1) an enrichment; (2) an

26    impoverishment; (3) a connection between the enrichment and impoverishment; (4) absence of

27    justification for the enrichment and the impoverishment; and (5) absence of a remedy provided by law.

28    *Community Guardian Bank v. Hamlin* (1995) 182 Ariz. 627, 630. Subsumed within the concept of

Cohon & Pollak, LLP

1  "enrichment" is that conferral of a benefit must be alleged and proved to establish a claim for restitution

2  on the grounds of unjust enrichment. *USLife Title Company of Arizona v. Gutkin*, (1986) 152 Ariz. 349,

3  354; *Laborers' and Operating Engineers' Utility Agreement Health & Welfare Trust Fund for Arizona*

4  *v. Phillip Morris, Inc.* (D.Ariz. 1999) 42 F.Supp.2d 943, 951.

5      Unjust enrichment is warranted when the plaintiff has conferred a benefit upon the defendant

6  particularly in reliance upon an agreement which is unenforceable. *Arnold & Associates, Inc. v. Misys*

7  *Healthcare Systems*, (D.Ariz. 2003) 275 F.Supp.2d 1013, 1024.

8      Moreover, unjust enrichment is a form of restitution.  "Restitution is limited to 'restoring the

9  status quo and ordering the return of that which rightfully belongs to the purchaser or tenant.'

10  [Citation]."  *Tull v. United States* (1987) 481 U.S. 412, 424.

11      Here, there is no evidence that any of the plaintiffs parted with any money and paid or delivered

12  it to Land Holding. Plaintiffs have surmised and speculated that ITC Homes loaned money to Land

13  Holding., which even if that were true, then the restitutionary remedy would belong to ITC Homes, not

14  to any of the plaintiffs.

15      Moreover, there has never been any agreement (enforceable or unenforceable) between any of

16  the plaintiffs and Land Holding.  (Trial Testimony of Moshe Gedalia dated 9/30/2009 at 32:18 through

17  33:18.) Since unjust enrichment is a form quasi contract relief, it would have no application in this

18  instance.  Indeed, there were no dealings between plaintiffs and The Land Holding Group, much less

19  discussions over a contract.

20      E.    Plaintiffs' Arguments Are Against ITC Homes, Inc. and Ron Amiran, Not The Land

21            Holding Group, Inc., and Are The Subject of A Full and Complete General Release.

22            1.    The Gedalias' Settled And Released The Claims Raised In This Proceeding.

23      "Settlement agreements are interpreted according to the principles of contract law. *Tucker v.*

24  *Tucker,* 203 F.3d 832, (9th Cir.1999) citing *Jeff D. v. Andrus,* 899 F.2d 753, 759 (9th Cir.1990); "The

25  construction and enforcement of settlement agreements are governed by principles of local law which

26  apply to interpretation of contracts generally." *United Commercial Ins. Serv., Inc. v. Paymaster Corp.,*

27  962 F.2d 853, 856 (9th Cir.1992).  Federal courts follow state law "even though the underlying cause

28  of action is federal." *United Commercial,* 962 F.2d at 856; *In re Beverly Hills Bancorp,* 649 F.2d 1329,

Cohon & Pollak,
LLP

1332-33 (9th Cir.1981).    Both federal and Arizona courts have long favored compromise and

settlement. *Dacanay v. Mendoza,* 573 F.2d 1075, 1078 (9th Cir.1978); *Emmons v. Superior Court,* 192

Ariz. 509, 512, 968 P.2d 582, 585 (Az.App.Ct.1998) citing *Phillips v. Musgrave,* 23 Ariz. 591, 594-95,

206 P. 164, 165 (1922).    "Generally, the construction and enforcement of settlement agreements,

including the determination as to the validity and scope of a release therein, are governed by general

contract principles under state law." *Hisel v. Upchurch,* 797 F.Supp. 1509, 1517 (D.Ariz.1992).

Plaintiffs/Counter Defendants Moshe Gedalia, Suzie Gedalia and M&S Unlimited, LLC entered

into a Settlement Agreement with ITC Homes, Inc., ITC Financial Services, Inc., Ron Amiran, Sue

Ellen Amiran, Doron Amiran, Sterling Realty Investment, Inc. fdba Mesonic America, Inc. and Regency

Consulting, Inc.   (Exhibit 304).   The Settlement Agreement was signed by the foregoing parties and

made effective January 28, 2007. (Exhibit 304).   The release section of the agreement is a broad general

release in which Moshe Gedalia, Suzie Gedalia and M&S Unlimited, LLC released and discharged ITC

Homes, Inc., ITC Financial Services, Inc., Ron Amiran, Sue Ellen Amiran, Doron Amiran, Sterling

Realty Investment, Inc. fdba Mesonic America, Inc. and Regency Consulting, Inc. "of and from any and

all manner of claims, obligations, demands, actions, causes of action, damages, judgments, losses and

liabilities whatsoever, in law or in equity, which such party had, now has, or may be asserted in the

future arising from the event referred to in the Nevada litigation, the Adversary Litigation or as a result

of or in connection with or for any matter, cause, event, transaction, relation or anything whatsoever

arising prior to the Effective Date."  (Exhibit 304 – Exhibit "B" at ¶ 16.)

The scope of the January 28, 2007 release is unquestionably broad and includes every possible

claim or defalcation that Moshe Gedalia, Suzie Gedalia and M&S Unlimited, LLC might have ever had

against defendants ITC Homes, Inc., ITC Financial Services, Inc., Ron Amiran, Sue Ellen Amiran,

Doron Amiran, Sterling Realty Investment, Inc. fdba Mesonic America, Inc. and Regency Consulting,

Inc.  To the extent that plaintiffs have devoted almost the entirety of their case here to establishing that

**Ron Amiran or ITC Homes** allegedly used ITC Homes funds in the acquisition of the Spanish Trails

property, then all of those claims were released in the January 28, 2007 Settlement Agreement.  See,

Exhibits 304 and 305.  Plaintiffs called Arthur Martin, Moshe Gedalia and Eeshak Gedalia and

questioned them at length about any information they might have to establish that Ron Amiran and ITC

1   Homes might have used ITC Homes funds in the acquisition of Spanish Trails.  Despite their best

2   efforts, none of them could testify that ITC Homes funds were used to acquire the Spanish Trails

3   property.

4        Attorney Scott Gibson, who was one of the attorneys who litigated the matter leading up to the

5   formation of the Settlement Agreement and who participated in the drafting and enforcement of the

6   Settlement Agreement, testified that the very claims raised in this proceeding were released in the

7   January 28, 2007 Settlement Agreement.  Mr. Gedalia agreed during his examination at trial that he is

8   complaining about Ron Amiran's or ITC Homes' alleged use of funds for the purchase of Spanish Trails

9   and that those claims were released in the January 28, 2007 Settlement Agreement.  (Trial testimony

10   of Moshe Gedalia 9/30/2009 at 89:19 through 93:8.)

11        2.    To The Extent That Plaintiff Argues That The Land Holding Group, Inc. Is

12        Liable Because It Was An Alleged Co-Conspirator/Joint Tortfeasor, The Release

13        Operates To Discharge Any And All Claims Against Land Holding

14        The Supreme Court of Arizona has declared that "[i]t is, of course, an elementary rule of law

15   that the liability of joint tortfeasors is joint and several and that the release of one releases all."

16   *Fagerberg v. Phoenix Flour Mills Co.,* 50 Ariz. 227, 71 P.2d 1022, 1025 (1937). In *Fagerberg,* the

17   injured party entered into a written agreement with one joint tortfeasor covenanting not to sue that party,

18   while attempting to reserve the right to sue the other joint tortfeasor. *Id.\* at 1025. After reiterating the

19   "elementary rule" that the "release of one releases all," the court was very deliberate in explaining that

20   a reservation of rights is only valid in a covenant not to sue, and not in a release." *Mann v. GTCR*

21   *Golder Rauner, LLC* (D.Ariz. 2006) 351 B.R. 685, 698.

22        The operative agreement at issue here is unquestionably a release.  (Exhibit 304.)  The only

23   question is whether the plaintiffs have identified The Land Holding Group, Inc. as a joint tortfeasor with

24   ITC Homes and Ron Amiran.  A review of the Complaint shows the following allegations: "Defendant

25   THE LAND HOLDING GROUP, INC. is owned and operated by Defendants Ron Amiran, Doran

26   Amiran, and/or Sue Ellen Amiran, is the alter ego of said Defendants, and/or has conspired or is

27   conspiring with said Defendants to commit the acts herein." (Complaint, ¶ 9.) Plaintiffs further allege

28   (in the only other charging allegations against The Land Holding Group) that it conspired with

Cohon & Pollak,
LLP

1  defendants ITC Homes and the Amirans to create various corporate entities (in this case The Land

2  Holding Group) to divert funds "earmarked" for Plaintiffs. (Complaint, ¶s 35 through 39.) In the Third

3  Count for RICO, The Land Holding Group is never mentioned by name, but plaintiffs allege that

4  Defendants, having failed to pay the monies due and owing to plaintiffs in accordance with signed

5  agreements, nonetheless have used proceeds due and owing Plaintiffs to enable them to create fictitious

6  entities for the sole purpose of investing in outside parcels of real property for their own benefit."

7  (Complaint ¶ 63(d)). There are no allegations in the Complaint asserted against The Land Holding

8  Group, Inc. where that defendant is accused of engaging in any activity, lawful or unlawful, without

9  acting in concert with ITC Homes or with Ron Amiran. Under Arizona law, the release of ITC Homes,

10  Ron Amiran, Doron Amiran and Sue Ellen Amiran legally and necessarily operates as a release of The

11  Land Holding Group, Inc.

12  **V.    LAND HOLDING'S COUNTER COMPLAINT**

13        A.    Intentional Interference with Prospective Economic Advantage

14        A claim for tortious interference with prospective economic advantage requires: (1) the

15  existence of a valid contractual relationship or business expectancy; (2) the defendant's knowledge of

16  the relationship or expectancy; (3) improper and intentional interference by the defendant inducing or

17  causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party

18  whose relationship or expectancy has been disrupted. *Miller v. Servicemaster*, 174 Ariz. 518, 521, 851

19  P.2d 143, 146 (1992).

20              1.    The Existence Of A Valid Contractual Relationship Or Business Expectancy.

21        Land Holding bought the Old Spanish Trails property for $1,600,000. (Exhibit 34.) Of the

22  $1,600,000 paid by The Land Holding Group, the first $800,000 was contributed by the shareholders,

23  David Melamed, Shawn Manshoory and Jacob Bachar. The remaining $800,000 was borrowed from

24  Tuesday Investments, Inc., a creditor in these proceedings. The sale of the Old Spanish Trails property

25  was handled through escrow and the transaction closed. (Trial Testimony of Ron Amiran dated

26  10/1/2009 at 121:9-11 and 125:19-22.)

27        Land Holding had applied and been promised a construction loan from First National Bank of

28  Arizona to finance the development of the Mansions at Spanish Trails. (Trial Testimony of Ron

Cohon & Pollak,
LLP

1    Amiran dated 10/1/2009 at 116:12 through 121:5 and Deposition Testimony of Chip Shaw 4:8-14, 5:1

2    to 6:2, 6:6 to 7:17, 7:22 to 17:16, 29:24 to 30:11, 31:12-24, 32:25 to 33:9, 34:9-17, 35:8 to 36:2, 38:1-9,

3    40:5-11; 43:12 to 44:10 and 45:3-15; Exhibits 21, 22, 23 and 42.)  Plaintiffs make much of the fact that

4    the formal loan agreement had not yet been signed; however, it would be improper to reward a party

5    for interfering with a loan committment up until the day before the loan papers are signed and thus deny

6    the borrower a right of action for interference with the *expectancy* of the loan.

7              2.    The Gedalias' Knowledge Of The Relationship Or Expectancy.

8              At the time the Gedalias flew to Tucson to meet with Chip Shaw, they knew about the loan to

9    Land Holding.  For starters, plaintiffs' counsel's opening statement makes the pithy promise that "you

10   will hear from opposing counsel about a meeting my client had with Chip Shaw who worked at First

11   National Bank of Arizona.  When Moshe [Gedalia] learned from his lawyers that Amiran was using his

12   financial guarantees and loans with the bank to try and obtain new loans on the Spanish Trail project,

13   he met with Mr. Shaw. [¶] Mr Gedalia told Mr. Shaw that he was not backing the Spanish Trails project.

14   He told him he knew nothing of this project until just recently and to not proceed with using any of his

15   financial backing for any of the loans on this project.    [¶]   He told him that Ron was a thief, and

16   Amiran had taken his money, and that that was proven, and that it would be proven in the Arizona

17   bankruptcy case which it ultimately was."  (Trial Record dated 9/17/2009 at 23:2-15.)   Plaintiffs'

18   counsel has described the meeting between Mr. Shaw and Mr. and Mrs. Gedalia before FNBA cancelled

19   its loan committment to Land Holding.  (Trial Testimony of Moshe Gedalia dated 9/30/2009 at 48:25

20   through 55:22 and 89:16 through 92:8.)  Indeed, on examination by his own counsel, Mr. Gedalia stated

21   under oath that he filed the lawsuit "because I find he [Amiran] -- he not pay me for the lots. He -- he --

22   he try to -- he buy the -- the Spanish Trail."  (Trial Testimony of Moshe Gedalia dated 9/30/2009 at

23   92:2-4.)  If Mr. and Mrs. Gedalia told Mr. Shaw that they were not backing the Spanish Trails project,

24   and since Mr. Gedalia filed the lawsuit because Amiran was buying Spanish Trail, it must be true that

25   they knew about the Spanish Trails project and FNBA's involvement!

26              3.    The Gedalias' Improper And Intentional Interference Inducing Or Causing A

27                   Breach Or Termination Of The Relationship Or Expectancy.

28   First National Bank of Arizona cancelled the construction loan to Land Holding because Mr.

Cohon & Pollak,
LLP

and Mrs. Gedalia filed the meritless lawsuit against Land Holding, made defamatory remarks about Ron Amiran and the Spanish Trails project and directed Chip Shaw to cancel the loan.  (Trial Testimony of Ron Amiran dated 10/1/2009 at 130:4 through 137:17 and Deposition Testimony of Chip Shaw 4:8-14, 5:1 to 6:2, 6:6 to 7:17, 7:22 to 17:16, 29:24 to 30:11, 31:12-24, 32:25 to 33:9, 34:9-17, 35:8 to 36:2, 38:1-9, 40:5-11; 43:12 to 44:10 and 45:3-15; Exhibits 21, 22, 23 and 42.)

        4.    <u>Land Holding Was Damaged By The Gedalias' Disruption Of The Expected Loan From First National Bank of Arizona.</u>

Land Holding has been damaged in the sum of at least $4,973,000 (accounting for the continued accumulation of interest after the preparation of Land Holding's expert's report dated September 28, 2008.  (Trial Testimony of Keith Bierman dated 10/2/2009 at 121:18 through 123:5; Exhibit 86.)

B.    <u>Abuse of Process</u>

The elements of an abuse of process claim under Arizona law are: " '(1) a willful act in the use of judicial process; (2) for an ulterior purpose not proper in the regular conduct of the proceedings.' " *Crackel v. Allstate Ins. Co.* 208 Ariz. 252, 92 P.3d 882, 887 (Ariz.App.2004) quoting *Nienstedt v. Wetzel*, 133 Ariz. 348, 651 P.2d 876, 881 (Ariz.App.1982).  Indeed, "Arizona has adopted a liberal view on the types of court processes that can support a claim [for abuse of process]." *Crackel, supra*, 258, fn.2.

A *lis pendens* is not a tool for a litigant to secure a potential money judgment by tying up a debtor's real property. *Farris v. Advantage Capital Corp.* (2007) 217 Ariz. 1, 3 citing to *West Pinal Family Health Center v. McBryde* (1989) 162 Ariz. 546, 549; *Mammoth Cave Production Credit Ass'n v. Gross* (1984) 141 Ariz. 389, 392.  Notice of lis pendens requires an assertion that rights concerning title to the property may be affected. *Patterson v. Bianco* (1991) 167 Ariz. 249, 252.  If the underlying litigation will not affect title to the property, a *lis pendens* should not be filed. *Ibid.*

Even a cursory review of the allegations of the Complaint, and in particular the prayer for relief at the end, will establish that Plaintiffs and counter-defendants did not assert a claim to ownership of the Spanish Trails property, much less assert any remedy that would have established ownership in any of the plaintiffs.  (See, Plaintiffs' Complaint.)  The plaintiffs do not allege a quiet title claim or a fraudulent transfer claim that would have sought an ownership interest in the property.  (See, Plaintiffs'

1   Complaint.)  This is consistent with the testimony at trial.

2          On direct examination, counsel for Plaintiffs and Counter Defendants elicited from Isaac Gedalia

3   (aka Eeshak Gedalia) that plaintiff and counter-defendants had filed a *lis pendens* against The Land

4   Holding Group's ownership interest in the Spanish Trails property.  (Trial testimony of Eeshak Gedalia

5   9/30/2009 at 141:16 through 144:6.)  Yet, Moshe Gedalia made clear in his trial testimony that plaintiffs

6   were never an owner of the Spanish Trails property and had no financial or other interest in the

7   development.  (Trial testimony of Moshe Gedalia 9/17/2009 at 164:10 through 168:22.)   At the time

8   the lis pendens was recorded against the Spanish Trails property, plaintiffs knew that its purpose was

9   to stop somebody from selling a piece of property.  (Trial testimony of Eeshak Gedalia 9/30/2009 at

10  141:16 through 144:6.)  Notably, there is no evidence that a sale of the Spanish Trails property was

11  pending or threatened.  The Gedalias also knew two of the owners of The Land Holding Group and

12  "eventually" realized that they had improperly recorded a lis pendens against the property and had it

13  withdrawn because they had in fact invested their own money in acquiring the property.  (Trial

14  testimony of Eeshak Gedalia 9/30/2009 at 141:16 through 144:6.)

15         However, at no time did Plaintiffs dismiss their legal claims against The Land Holding Group.

16  Instead of dismissing their lawsuit against The Land Holding Group, Inc., Moshe Gedalia and Suzie

17  Gedalia filed their lawsuit on November 14, 2005 and promptly thereafter flew from Los Angeles to

18  Tucson to meet with Chip Shaw and others at the First National Bank of Arizona.  (Trial Testimony of

19  Moshe Gedalia dated 9/30/2009 at 40:19 through 55:22.)  Mr. Gedalia did not meet with Mr. Shaw and

20  the other FNBA bank officials to discuss Santa Rita Acres Estates.   (Trial Testimony of Moshe Gedalia

21  dated 9/30/2009 at 40:19 through 55:22.)  He met with them for the purpose of persuading the bank to

22  stop the loan to The Land Holding Group from going through.  (Trial Testimony of Moshe Gedalia

23  dated 9/30/2009 at 40:19 through 55:22 and 89:16 through 92:8.)   Indeed, FNBA withdrew the loan

24  from The Land Holding Group precisely because of the plaintiffs lawsuit.  (Trial Testimony of Ronen

25  Amiran dated 10/1/2009 at through 130:4 though 137:17; See also, Deposition Testimony of Chip Shaw

26  4:8-14, 5:1 to 6:2, 6:6 to 7:17, 7:22 to 17:16, 29:24 to 30:11, 31:12-24, 32:25 to 33:9, 34:9-17, 35:8 to

27  36:2, 38:1-9, 40:5-11; 43:12 to 44:10 and 45:3-15; Exhibits 21, 22, 23 and 42.)

28  / / /

Cohon & Pollak,
LLP

1    Ulterior motive is a state of mind, which, like other states of mind, can seldom be proved by

2  direct evidence but must be inferred from objective or external circumstantial evidence.  Here, by filing

3  the lawsuit and taking the affirmative step to share it with the bank, the Gedalias clearly intended to

4  cause First National Bank of Arizona to cancel its loan committment to Land Holding.  The Gedalias

5  had a dispute, if at all, with ITC Homes, not with Land Holding.  Yet, the Gedalias knew that they were

6  bringing down Land Holding and any hope it had of developing the Spanish Trails project.

7    C.    Quiet Title

8    Land Holding bought the Old Spanish Trails property for $1,600,000 with money contributed

9  solely by David Melamed, Shawn Manshoory and Jacob Bachar, and a loan from Tuesday Investments.

10  The Gedalias do not claim to have an ownership interest in the Old Spanish Trails property.  (Trial

11  Testimony of Moshe Gedalia dated 9/30/2009 at 70:12-19.)  As such, this Court must quiet title in the

12  Spanish Trails property in Land Holding.

13  Date:   December 9, 2009                    COHON & POLLAK, LLP

14                                              BY:   /s/ Jeffrey M. Cohon
                                                Jeffrey M. Cohon, Esq.
15                                              Attorneys for Defendant
                                                The Land Holding Group, Inc.

16

17

18

19

20

21

22

23

24

25

26

27

28

Cohon & Pollak,
LLP