1  JEFFREY M. COHON, ESQ. (CSBN 131431)
   Admitted Pro Hac Vice
2  **COHON & POLLAK, LLP**
   1999 Avenue of the Stars, Suite 1100
3  Los Angeles, California 90067
   Tel:   (310) 231-4470
4  Fax:   (310) 231-4610

5  Attorneys for Defendant
   The Land Holding Group, Inc.
6

7

8                  UNITED STATES BANKRUPTCY COURT

9                        DISTRICT OF NEVADA

10

11  In re:                            )   CASE NO. BK-S-07-16852-BAM
                                      )
12  THE LAND HOLDING GROUP, INC.      )   Adv. Proceeding No. 2-08-01010-BAM
                                      )
13            Debtor.                 )   **RESPONSE OF DEFENDANT AND**
    _____   )   **COUNTER CLAIMANT THE LAND**
14                                    )   **HOLDING   GROUP,   INC'S   TO**
    MOSHE GEDALIA, ET AL,             )   **PLAINTIFFS' POST TRIAL BRIEF**
15                                    )
              Plaintiffs,             )   Oral Argument:
16          vs.                       )
                                      )   Date:  December 23, 2009
17  THE LAND HOLDING GROUP, INC.,     )   Time: 9:30 a.m.
    ET AL,                            )   Ctrm: 3
18                                    )
              Defendants.             )
19  _____   )
                                      )
20  AND RELATED COUNTERCLAIM          )
    _____   )
21

22

23         Defendant and Counter-Claimant The Land Holding Group, Inc. presents the

24  following brief in response to the initial Post Trial Brief filed by Plaintiffs Moshe

25  Gedalia, Suzie Gedalia and M&S Unlimited, LLC.

26  / / /

27  / / /

28  / / /

                                      1
    _____
    **RESPONSE OF DEFENDANT AND COUNTER CLAIMANT THE LAND HOLDING
    GROUP, INC'S TO PLAINTIFFS' POST TRIAL BRIEF**

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.    THE SUBSTANTIVE LAW OF ARIZONA LAW APPLIES TO THIS CONTROVERSY**

"Adversary proceedings conducted in the bankruptcy court to determine the validity and amount of claims against the debtor's estate are brought under federal bankruptcy jurisdiction. 28 *U.S.C.* §§ 1334 and 157. The substantive law applied to determine the origin and existence of a claim is state law, unless the Bankruptcy Code otherwise provides. [citations omitted]. However, while the validity of a claim is determined by state law, the allowance or disallowance of a claim is strictly a matter of federal law and is left to the bankruptcy court's just exercise of its equitable powers. [citations omitted]." *In Re Fantastik, Inc.* 49 B.R. 510, 512-513 (Bkrtcy. Nev. 1985).

The parties appear to agree that the **substantive law of Arizona** applies to determine the origin and existence of the claims and counter-claims raised in these proceedings. (Plaintiff's Post Trial Brief, at 9:1-4; Land Holding's Post Trial Brief at 6:1 to 7:18.)

**II.    LAND HOLDING'S RESPONSE TO PLAINTIFF'S ADVERSARY CLAIMS AGAINST THE LAND HOLDING GROUP, INC.**

    A.    Plaintiffs Have Not Established a Claim Against The Land Holding Group, Inc. For Violation Of The Nevada RICO Statutes.

Plaintiffs devote undue time and effort to their first cause of action for violation of the Nevada RICO statutes. However, their arguments fail for several reasons.

        1.    The Burden of Proof Required to Establish A Violation of Nevada RICO is Clear and Convincing

Where RICO is premised on fraudulent activity, **the burden of proof on a federal RICO claim within the Ninth Circuit is clear and convincing**. *NMB Air Operation Corp. v. McEvoy* 194 F.3d 1317 (9th Cir. 1999). Defendant Land Holding was unable to find a similar civil case discussing the burden of proof under the Nevada RICO statutes; however, given the fact that the Nevada RICO statutes are patterned after the

2

federal RICO statutes, it is presumed that the same standard of proof should apply. *Allum v. Valley Bank of Nevada* (1993) 109 Nev. 280, 281, fn.2;  Cf. *Siragusa v. Brown* (1998) 114 Nev. 1384, 1398.

2. There Is No Aiding And Abetting Liability Under RICO

Plaintiffs concede that there is **no evidence of predicate acts committed by Land Holding**. (Plaintiff's Post Trial Brief, 6:30 to 7:1.)  Rather, Plaintiffs repeatedly argue that Ron Amiran committed the predicate acts in violation of the Nevada RICO statutes (Plaintiff's Post Trial Brief at 4:12-13 and 6:21-28) and that David Melamed "aided and abetted" Mr. Amiran in the commission of as yet unspecified predicate crimes. (Plaintiff's Post Trial Brief at 6:30 to 7:2.)

Even if plaintiffs were correct on the facts, which they are not, there is no legal liability for aiding and abetting a RICO violation.  In 1994, the United States Supreme Court decided  *Central Bank of Denver v. First Interstate Bank of Denver* 511 U.S. 162 (1994).  There, the plaintiff brought claims against various defendants for violation of Section 10(b) of the Securities Exchange Act of 1934.  Plaintiff argued that certain defendants were directly liable to plaintiff and that others were liable on a theory of aiding and abetting, as they had not committed any direct RICO violations.   The Supreme Court held that "liability for aiding and abetting would not be read into a statute: 'Congress has not enacted a general civil aiding and abetting statute.... Thus, when Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors.'" *Central Bank of Denver* at 182.

In reliance on the Supreme Court's holding in *Central Bank of Denver*, a series of courts around the United States have held that federal RICO **does not** permit a plaintiff to hold aiders and abetters liable for a violation of the civil RICO statutes. *Westways World Travel v. AMR Corp.*, 182 F.Supp.2d 952, 961 (N.D.Cal.2001) [The majority of courts which have addressed the issue of whether aiding and abetting a RICO

3

violation exists have determined that it does not.] *Rolo v. City Investing Co. Liquidating, Trust,* 155 F.3d 644, 657 (3rd Cir. 1988), *Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison,* 955 F.Supp. 248, 255-56 (S.D.N.Y.1997) ["Because the text of the RICO statute does not encompass a private cause of action for aiding and abetting a RICO violation," such an action "cannot survive the Supreme Court's decision in *Central Bank of Denver*"]; *In re Lake States Commodities, Inc.,* 936 F.Supp. 1461, 1475 (N.D.Ill.1996), and *Department of Economic Dev. v. Arthur Andersen & Co.,* 924 F.Supp. 449 (S.D.N.Y.1996); *King v. Deutsche Bank AG* (D.Or. 2005) 2005 WL 611954 at *28. ["I conclude that aiding and abetting liability does not survive *Central Bank of Denver.*"]

In almost all respects, the Nevada RICO statutes are patterned after the federal RICO statutes. *Allum v. Valley Bank of Nevada* (1993) 109 Nev. 280, 281, fn.2. Cf. *Siragusa v. Brown* (1998) 114 Nev. 1384, 1398. In this particular case, the two RICO statutory schemes are identical in that the Federal and Nevada RICO statutes **do not** provide for aiding and abetting liability. To the contrary, the Nevada RICO statutes require that the defendant to be held liable must actually commit the predicate acts. *Allum v. Valley Bank of Nevada* (1993) 109 Nev. 280, 286. (See, Section II(c), below.)

Had there been a single case or statutory reference to aiding and abetting liability under the Nevada RICO statutes, it would most certainly have been included in the plaintiff's Post Trial Brief. There is no such authority. The absence of any such citation in the Plaintiff's Post Trial Brief is further confirmation that no such rule exists.

3.  Plaintiffs Fail To Allege Aiding and Abetting Liability Against Land Holding And Therefore Cannot Make That Claim At Trial.

Pleadings frame the issues for trial and define the scope of relevant evidence. *White v. ARCO/Polymers, Inc.* 720 F.2d 1391, 1396 (5th Cir. 1983). Under a federal pleading requirement, plaintiffs must plead aiding and abetting liability in their complaint, with the same specificity requirement for the substantive claim. *Neilson v. Union Bank of California, N.A.* 290 F. Supp.2d 1101, 1130 (C.D.Cal. 2003).

4

Plaintiffs' failure to plead aiding and abetting liability precludes them from advancing the issue at trial. Notably, the first time the plaintiffs mention aiding and abetting is their written closing argument. At no time prior did plaintiffs ever mention an aiding and abetting theory.

    4.    <u>Only A Defendant Actually Committing A Recognized RICO Violation Can Be Sued Under The Nevada RICO Statute</u>.

The Courts interpreting Nevada's RICO statute have concluded that "to sue under RICO, the plaintiff's injury must be directly caused by the ***defendant's violation*** of a predicate RICO act." (Emphasis added). *Allum v. Valley Bank of Nevada* (1993) 109 Nev. 280, 286. The Nevada Supreme Court added, "Because our legislature patterned Nevada RICO after [Federal] RICO, we conclude that the Nevada legislature intended a like result. Accordingly, we hold that to bring suit under Nevada RICO, the plaintiff's damages must be proximately caused ***by defendant's violation*** of a predicate Nevada RICO act." (Emphasis added.) *Ibid.*

The law governing the identical [Federal] RICO provision requires ***active participation*** by the members of the alleged enterprise. Specifically, the members of the alleged enterprise must have ***directed*** the activities of the criminal enterprise. *Reeves v. Ernst & Young* 507 U.S. 170, 113 S.Ct.1163, 122 L.Ed.2d 525 (1993).

In *Baumer v. Pachl* 8 F.3d 1341, 1344 (9th Cir. 1993), the Ninth Circuit held that defendant accountant who "knowingly filed a false partnership agreement in which he inflated the number of limited partners and mailed to the limited partners copies of the agreement, to create the false impression that Golden Hills was formed and operated in accordance with law," was not liable for a RICO violation. Hence, the law governing RICO, under both Nevada and Federal law, require that a defendant must directly engage in the prohibited predicate acts.

Plaintiffs cite one case for the proposition that a defendant's "general awareness" of another's fraudulent activities may result in the imposition of liability. In *Wells Fargo Bank v. Arizona Laborers, Teamsters, Cement Masons Local No. 395 Pension*

5

*Trust Fund*, (2002) 201 Ariz. 474, the plaintiff sought declaratory relief that it complied with specified provisions of a loan agreement. Defendant cross-complained, arguing, *inter alia*, that plaintiff had aided and abetted a fraud on defendant.

First, *Wells Fargo* is inapplicable as it does not involve a RICO claim of any kind. As shown above, RICO involves a specialized analysis applying a particular set of statutory rules. Second, *Wells Fargo* analyzed the application of aiding and abetting principles to a claim for fraud, which has been dismissed from the instant case. *Wells Fargo* at 488. Third, *Wells Fargo* was decided under *Arizona law*, yet the plaintiffs purport to apply that rule to their claim for violation of the *Nevada RICO statutes*. The so-called "general awareness" rule enunciated in *Wells Fargo* has no application to this case or to RICO cases at all.

Plaintiffs rely on a second case for the proposition that "substantial assistance" by a party may constitute aiding and abetting. *Armstrong v. McAlpin* 699 F.2d 79 (C.A.N.Y. 1983). Armstrong is inapposite for a variety of reasons. First, *Armstrong* did not involve RICO. Rather, the cited portion of the case involved the definition of aiding and abetting in a securities case involving churning. *Id* at 91. Second, the definition of aiding and abetting liability in a churning case was defined for the Second Circuit: "The general requirements for establishing aiding and abetting liability are well settled <u>*in this Circuit*</u>. Plaintiffs must prove (1) a securities law violation by a primary wrongdoer, (2) knowledge of the violation by the person sought to be charged, and (3) proof that the person sought to be charged substantially assisted in the primary wrongdoing." *Id* at 91. The Court in *Armstrong* then analyzed the level of "assistance" required where the defendant was a fiduciary and where the defendant was not a fiduciary. Notably, in those cases where the defendant did not owe a fiduciary duty to the plaintiff (as in the case at bar), the court in *Armstrong* noted that "[i]f there is no fiduciary duty, the "scienter" requirement scales upward [and] the assistance rendered must be knowing and substantial." Even if *Armstrong* had any application here, there is no evidence of any "knowing and substantial" assistance to Ron Amiran.

6

1    Additionally, *Armstrong* was decided before *Central Bank of Denver v. First*

2    *Interstate Bank of Denver* 511 U.S. 162 (1994) and the multitude of cases which

3    followed holding that aiding and abetting has no application in RICO cases.

4    Finally, plaintiffs cite to *Woodward v. Metro Bank of Dallas* 522 F.2d 84 (5th Cir

5    1975) in further support of its general awareness argument.    However, in the cited

6    section of the *Woodward* decision, the court had to decide on the level of scienter

7    required for a violation of a narrow section of the federal securities laws. "We think that

8    the best solution is a blend of the *Coffey* test and the *Strong* test.  When it is impossible

9    to find any duty of disclosure, an alleged aider-abettor should be found liable only if

10    scienter of the high "conscious intent" variety can be proved.  Where some special duty

11    of disclosure exists, then liability should be possible with a lesser degree of scienter."

12    *Id* at 97.  As with *Wells Fargo*, *Woodward* did not involve a state or federal RICO claim

13    or any statutory construction remotely similar to the case at bar.  Moreover, this is not

14    a case of disclosure under the securities laws, and as such, the *Woodward* court's

15    discussion has no application to this case.

16    Like *Armstrong*, *Woodward* was also decided before *Central Bank of Denver v.*

17    *First Interstate Bank of Denver* 511 U.S. 162 (1994) and the cases which followed

18    holding that aiding and abetting has no application in RICO cases.

19    In short, the only cases presented to this Court require the plaintiff to show

20    specific acts of misconduct on the part the defendant – and only the defendant.  Here, the

21    plaintiffs concede that there was no specific act of criminal conduct as required by

22    Nevada's civil RICO statutes.

23    5.    <u>Plaintiffs Offer No Analysis Of The Predicate Acts.</u>

24    Plaintiffs *assume* that Amiran has committed "two predicate acts" required for

25    RICO.    However, there is no **evidence** of grand larceny, embezzlement, taking of

26    property not amounting to robbery and obtaining property by false pretense.  Plaintiffs

27    offer **conclusions** but present no evidence.

28

7

Cohon & Pollak, LLP

B.    Unjust Enrichment

Plaintiffs incorrectly state the law and present facts which were never established at trial. Under Arizona law, unjust enrichment is based on five elements: (1) an enrichment; (2) an impoverishment; (3) a connection between the enrichment and impoverishment; (4) absence of justification for the enrichment and the impoverishment; and (5) absence of a remedy provided by law. *Community Guardian Bank v. Hamlin* (1995) 182 Ariz. 627, 630. Plaintiffs' citation to *Johnson v. American National Insurance Co.* (1980) 126 Ariz. 219 is inapposite because the case only references a single element of the unjust enrichment cause of action, for the simple reason that the court easily disposed of the dispute on the fatal fact that the parties had already entered into a written agreement. *Id* at 223. Here, the plaintiffs failed to present facts to support the five required elements of the unjust enrichment count.

From a factual perspective, plaintiffs take incredible license in their argument.

(a)    Plaintiffs claim that they "conclusively establishe[d]" that Ron Amiran used funds in the amount of $225,000 to purchase Regency's interest in Land Holding and therefore Spanish Trail. There is no citation to the trial transcript and no such "fact" was ever established at trial. Even if such fact were established, which it was not, plaintiffs settled their claims with Ron Amiran and ITC Homes.

(b)    Plaintiffs also claim that Amiran embezzled $225,000 in funds from the Gedalias. Again, there is no citation to the trial transcript and no such "fact" was ever established at trial. Even if such fact were established, which it was not, plaintiffs settled their claims with Ron Amiran and ITC Homes.

(c)    Plaintiffs next claim that after the lawsuit was filed, Melamed paid Amiran the $225,000 and received an additional 25% interest in Land Holding. Once again, there is no citation to the trial transcript and no such "fact" was ever established at trial. And once again, even if such fact were established, plaintiffs settled their claims with Ron Amiran and ITC Homes. If the statement were true, then Melamed parted

8

with $225,000 and paid fair value for a 25% interest in Land Holding, in which case, plaintiffs concede that Melamed could not have aided and abetted Amiran or ITC. Otherwise, he would not have paid $225,000 for a 25% interest in Land Holding.

(d)    Plaintiffs next contend, without citation to the trial record, that Melamed knew about the Gedalias' lawsuit at the time he paid $225,000 for the interest in Land Holding, and therefore, he had a duty to inquire about the source of the funds. Notably, there is no allegation in the plaintiffs' Complaint alleging the use of $225,000 to acquire an interest in Land Holding or Spanish Trails, and hence, there can be no notice of any alleged use of $225,000. It is an uncontroverted fact that David Melamed, Shawn Manshoory and Jacob Bachar contributed $900,000 to acquire the Spanish Trails property, which includes the first $100,000 for the development of the property. (Trial testimony of David Melamed dated 10/2/2009 at 16:5-9; Trial testimony of Shawn Manshoory dated 10/2/2009 at 81:6-18; Trial testimony of Jacob Bachar dated 10/2/2009 at 86:10-13.) In addition, Tuesday Investments, Inc. loaned an additional $800,000 toward the acquisition of the Spanish Trails property. (Trial testimony of Danny Siag dated 10/2/2009 at 91:4-8.) Despite the opportunity to cross examine these four witnesses, plaintiffs did not contest the fact that these witnesses paid $1,600,000 ***of their own money*** for the acquisition of the Spanish Trails property. They did not use money from ITC Homes or Mr. Amiran. Hence, there was no need to inquire of anyone about the source of funds that were never used to acquire the Spanish Trail property.

In short, the theory of unjust enrichment is inapplicable to this dispute both factually and legally.

C.    Fraud

Plaintiffs' nine-line argument appears to be nothing more than a throw away gesture and not meant as a serious analysis of fraud. There is no analysis of the elements of fraud. It is uncontested that defendants made no representations, much less any misrepresentations, to any of the plaintiffs.

/ / /

9

1    To the extent that plaintiffs make a single sentence contention that Land Holding

2  is "jointly liable" for the alleged fraud of Amiran or ITC Homes, plaintiffs cannot even

3  get to first base on this argument since they did not plead an aiding and abetting theory

4  against Land Holding.  Moreover, plaintiffs presented no evidence that Land Holding

5  engaged in a single act of fraud or conspiracy to commit fraud.  Finally, plaintiffs

6  presented no evidence of fraud on the part of Ron Amiran.  Indeed, the evidence was to

7  the contrary.  After plaintiffs accused Ron Amiran of fraud, Judge Hollowell placed Ron

8  Amiran and ITC Homes back in charge of the project at Santa Rita Acres Estates.  (Trial

9  testimony of Scott Gibson 38:5 to 41:2; Exhibits 306 and 307.)  After an evidentiary

10  hearing, the court placed Ron Amiran and ITC Homes in charge of a multi-million dollar

11  real estate development.  Plaintiffs made the same argument in Tucson and failed.

## III.    LAND HOLDING GROUP, INC'S COUNTERCLAIM

### A.    Intentional Interference With Prospective Economic Advantage.

14    At the outset, Plaintiffs observe that Arizona law applies to this dispute.

15  Nevertheless, the Gedalias cite to *LTR Stage Lines v. Gray Line Tours* (1990) 106 Nev.

16  283, a Nevada case, for the elements of the claim for intentional interference with

17  prospective economic advantage or expectancy.  Unless the elements were materially

18  different, the mistaken citation would be irrelevant.  In the instant case, however, it is

19  relevant since the elements in Arizona are different from the elements in Nevada.

20  Indeed, under Arizona law it is not necessary to prove the absence of privilege or

21  justification since those are treated as affirmative defenses.  In Nevada, the absence of

22  privilege or justification are elements of the offence.  Hence, Land Holding need not

23  prove that the Gedalias' acts were privilege or justified.

24    In their brief, the Gedalias attack three elements: (1) knowledge of the prospective

25  relationship, (2) absence of justification and (3) intent to cause harm to Land Holding.

26  On both counts, the Gedalias are mistaken.

27  / / /

28  / / /

Cohon & Pollak,
LLP

**RESPONSE OF DEFENDANT AND COUNTER CLAIMANT THE LAND HOLDING
GROUP, INC'S TO PLAINTIFFS' POST TRIAL BRIEF**

1.    <u>The Gedalias' Knowledge of the Prospective Relationship</u>

The Gedalias make a single sentence statement that "Land Holding did not present any proof that the Gedalias were aware of the potential contractual relationship between Land Holding [and First National Bank of Arizona] at the time the lawsuit was filed." (Plaintiff's Post Trial Brief.  20:1-2).  The evidence is to the contrary because the Gedalias were acutely aware of the prospective relationship between Land Holding and First National Bank of Arizona at the time the lawsuit was filed.  As explained in the initial brief, plaintiffs' counsel's opening statement promised that "you will hear from opposing counsel about a meeting my client had with Chip Shaw who worked at First National Bank of Arizona.  When Moshe [Gedalia] learned from his lawyers that Amiran was using his financial guarantees and loans with the bank to try and obtain new loans on the Spanish Trail project, he met with Mr. Shaw.  [¶] Mr Gedalia told Mr. Shaw that he was not backing the Spanish Trails project.  He told him he knew nothing of this project until just recently and to not proceed with using any of his financial backing for any of the loans on this project.   [¶]   He told him that Ron was a thief, and Amiran had taken his money, and that was proven, and that it would be proven in the Arizona bankruptcy case which it ultimately was."  (Trial Record dated 9/17/2009 at 23:2-15.)  Plaintiffs' counsel has described the meeting between Mr. Shaw and Mr. and Mrs. Gedalia ***before*** FNBA cancelled its loan commitment to Land Holding. (Trial Testimony of Moshe Gedalia dated 9/30/2009 at 48:25 through 55:22 and 89:16 through 92:8.)

The United States Supreme Court has long recognized the binding effect of counsels' statements made in open court.  Over one hundred years ago in *Oscanyan v. Arms Co.*, 103 U.S. 261 (1880) Justice Field, writing the opinion for the majority, found that the plaintiff in an action to recover sales commissions was bound by an admission of his counsel during counsel's opening statement.  The Supreme Court reasoned that:

In the trial of a cause the admissions of counsel, as to matters to be proved, are constantly received and acted upon. They may dispense with proof of

11

facts for which witnesses would otherwise be called. They may limit the demand made or the set-off claimed. Indeed, any fact, bearing upon the issues involved, admitted by counsel, may be the ground of the court's procedure equally as if established by the clearest proof.

The Court further determined that there were no unguarded expressions used, nor any ambiguous statements made, and that counsel was fully apprised of all the facts underlying his client's claim.  Since the decision in *Oscanyan*, federal courts have conclusively bound parties to statements made by their attorneys during trial.  See, *Rhoades v. United Air Lines, Inc.* 340 F.2d 481, 484 ["[A]n admission of counsel in the course of trial is binding upon his client [and is] a point of law upon which there is little dispute."];  *Collins v. Texas Co.* 267 F.2d 257, 258 (5th Cir. 1959); *Dick v. United States* 40 F.2d 609, 611 (8th Cir. 1930).  The Second Circuit recently applied *Oscanyan* and noted that "the general admissibility of an attorney's statement, as well as the binding effect of an opening statement within the four corners of a single trial, are thus well established."  *United States v. McKeon* 738 F.2d 26, 30 (2nd Cir. 1984).

Mr. Shaw testified that he met with Mr. Gedalia, that the meeting concerned the Gedalias' lawsuit and that Mr. Gedalia told Mr. Shaw that he had initiated litigation against Land Holding Group, Inc.  (Trial/Deposition Testimony of Chip Shaw dated August 21, 2009 at 10:9-24.)  That meeting took place before First National Bank of Arizona cancelled the loan transaction, especially in view of Chip Shaw's sworn testimony that Mr. Gedalia's lawsuit against Land Holding was the basis for the bank's cancellation of the loan to Land Holding.  (Trial/Deposition Testimony of Chip Shaw dated August 21, 2009 at 10:25 to 13:12.)

Finally, Mr. Gedalia stated under oath that he filed the lawsuit "because I find he [Amiran] -- he not pay me for the lots. He -- he -- he try to -- he buy the -- the Spanish Trail."  (Trial Testimony of Moshe Gedalia dated 9/30/2009 at  92:2-4.)  Clearly, Mr. Gedalia knew about the Spanish Trail property before he filed the lawsuit and, in fact,

12

confessed that he filed the lawsuit *because* Ron Amiran is alleged to have bought the Spanish Trail property.  If Mr. and Mrs. Gedalia told Mr. Shaw that they were not backing the Spanish Trails project, and since Mr. Gedalia filed the lawsuit because Amiran was buying Spanish Trail, it must be true that they knew about the Spanish Trails project and FNBA's involvement!

2.    Absence of Justification

Under Arizona law, the issue of justification to interfere with a contract or with a prospective business advantage or expectancy is an affirmative defense, and not an element of the offence.  *Chanay v. Chittenden* (1977) 115 Ariz. 32, 37-38.  Moreover, the burden is on the defense to establish a justification defense to an intentional interference claim.  *Ibid.*

First, the defense of justification was not plead among the seventeen affirmative defenses asserted in the Gedalias' Answer to Land Holding's Counter-Claim.  The Gedalias' failure to plead the defense of justification results in its waiver.  *Enlow v. Salem-Keizer Yellow Cab Co., Inc*. 389 F.3d 802, 819 (9th Cir. 2004).  In *MEI Intern., Inc. v. Schenkers Intern. Forwarders, Inc*. 807 F.Supp. 979 (S.D.N.Y. 1992), the Court held that the defendants' "failure to raise the [affirmative defense] prior to their post trial briefs constitutes a waiver of the defense." *Id* at 990.  Although this should be the end of the justification analysis, nevertheless Land Holding will explain why the justification defense has no merit.

The Gedalias base their justification defense on the red-herring contention that because Land Holding embezzled money from the Gedalias – a statement which has no factual support – and because Ron Amiran settled with the Gedalias for $9,000,000 (which is a misleading statement), *ergo*, the filing of the lawsuit against Land Holding was justified.  First, Land Holding did not embezzle any money from the Gedalias.  Notably, it has been the Gedalias' contention all along that ITC diverted money to invest in various enterprises, but it has never been plead or established that Land Holding engaged in any embezzlement.  Further to that point, the Gedalias settled all of their

13

Cohon & Pollak, LLP

claims against ITC and the Amirans, and have been made whole by the terms of the settlement negotiated through their counsel and after approval by Judge Hollowell in the United States Bankruptcy Court for the District of Arizona (Trial Testimony of Scott Gibson dated 10/1/2009 at 7:21 to 11:15.)

Secondly, it is difficult to see how the Gedalias apply the flawed reasoning that because they settled with ITC and with the Amirans that it necessarily follows that "the filing of the lawsuit against Land Holding was justified." Even if the Gedalias were "justified" in suing the Gedalias, it does not mean that they were legally justified in suing Land Holding. Though they did not sue the escrow company that handled the sale of the Spanish Trails proeprty, would the Gedalias have been justified in suing the escrow company that handled the sale merely because they were involved in the transaction? Though they did not sue the real estate agents/brokers, would the Gedalias have been justified in suing the real estate agents/brokers that were handling the purchase and sale of the Spanish Trails property? Though they did not sue First National Bank of Arizona, would the Gedalias have been justified in suing the First National Bank of Arizona just because they were the construction lender that was about lend the construction financing for the Spanish Trails project? The answer is no. The Gedalias named Land Holding in the initial lawsuit (not as a later added defendant as Isaac Gedalia testified), and then the Gedalias took the affirmative step of flying from Los Angeles to Tucson to meet with Chip Shaw to convince him to cancel the loan on the Spanish Trails property. They had no evidence of any wrong doing by Land Holding, only an erroneous suspicion that Ron Amiran was diverting ITC money (not the Gedalias' money) to Spanish Trails.

The Gedalias also base their defense on Land Holding's alleged rejection of a settlement offer to acquire the Spanish Trails property from Land Holding. First, offers of settlement are excludable pursuant to Federal Rule of Evidence, Rule 408. Indeed, the Gedalias are attempting to use the alleged offer "to prove liability or invalidity of a claim or its amount." Moreover, if the evidence of a settlement offer is admissible, the

14

**RESPONSE OF DEFENDANT AND COUNTER CLAIMANT THE LAND HOLDING GROUP, INC'S TO PLAINTIFFS' POST TRIAL BRIEF**

1  Gedalias' alleged settlement offer to take the Spanish Trails property off the hands of

2  Land Holding, shortly after the filing of the Gedalias' lawsuit, only bolsters Land

3  Holding's argument that the lawsuit was filed for the improper purpose of stopping the

4  development, making the land virtually worthless and then taking the land away from

5  Land Holding for nothing.

6            3.    The Gedalias Intended To Cause Harm To Land Holding.

7       The Gedalias intended to cause the very harm to Land Holding that Moshe

8  Gedalia promised he would.  Not surprisingly, the Gedalias argue that they never

9  intended to cause harm to Land Holding.  However, Mr. Shaw testified that he met with

10 Mr. (and Mrs.) Gedalia, that the meeting concerned the Gedalias' lawsuit and that Mr.

11 Gedalia told Mr. Shaw that he had initiated litigation against Land Holding Group, Inc.

12 (Trial/Deposition Testimony of Chip Shaw dated August 21, 2009 at 10:9-24.)

13 Immediately on the heels of Mr. Shaw's meeting with the Gedalias, First National Bank

14 of Arizona cancelled the construction loan to Land Holding precisely because Mr. and

15 Mrs. Gedalia filed the meritless lawsuit against Land Holding, made defamatory remarks

16 about Ron Amiran and the Spanish Trails project and directed Chip Shaw to cancel the

17 loan. (Trial Testimony of Ron Amiran dated 10/1/2009 at 130:4 through 137:17 and

18 Deposition Testimony of Chip Shaw 4:8-14, 5:1 to 6:2, 6:6 to 7:17, 7:22 to 17:16, 29:24

19 to 30:11, 31:12-24, 32:25 to 33:9, 34:9-17, 35:8 to 36:2, 38:1-9, 40:5-11; 43:12 to 44:10

20 and 45:3-15; Exhibits 21, 22, 23 and 42.)   Moreover, Mr. Michaelides' opening

21 statement made clear that Mr. and Mrs. Gedalia intended to cause the result and the harm

22 of cutting off all construction financing to Land Holding.  The Gedalias claim to have

23 realized the error of their ways when they withdrew the lis pendens, but yet they did not

24 dismiss their lawsuit.  Curiously, the Gedalias claim that Melamed had a duty of inquiry

25 before acquiring Regency's 25% interest in Land Holding, yet the Gedalias would have

26 this court believe that they could simply shoot and ask questions later when it came to

27 suing Land Holding.   That is simply not the law.

28

Cohon & Pollak,
LLP

**RESPONSE OF DEFENDANT AND COUNTER CLAIMANT THE LAND HOLDING
GROUP, INC'S TO PLAINTIFFS' POST TRIAL BRIEF**

B.    Abuse of Process

The Gedalias raise two issues in opposing the claim for abuse of process.  First, the Gedalias make the conclusory statement that Land Holding introduced no evidence of "ulterior purpose."  The Gedalias had an ulterior purpose, namely the cancellation of the FNBA construction loan so that Land Holding could not develop Spanish Trails, and through their offer of taking the property off Land Holding's hands, it included the forced transfer of the property for nothing.

Secondly, the Gedalias contend that they did not engage in a wilful act in the use of the legal process which was improper in the regular conduct of the proceeding. Nothng could be further from the truth.  This prong of the test simply requires that the use of the lawsuit serve an end other than which it was designed to accomplish. *Morn v. City of Phoenix* (1986) 152 Ariz. 164.  It is the subsequent misuse of process which establishes liability for abuse of process. *Nienstedt v. Wetzel* (1982) 133 Ariz. 348. Immediately upon filing the lawsuit, the Gedalias flew to Tucson and met with Chip Shaw at First National Bank of Arizona to convince him to cancel the construction loan to Land Holding.  The cancellation of the construction loan was not the legitimate purpose in filing in the lawsuit, rather, at best it was the assertion of a claim for damages and/or the imposition of a constructive trust on the resulting profits of the enterprise. By using the lawsuit to cause the bank to cancel the loan, the Gedalias used the lawsuit for an improper purpose.

C.    Quiet Title.

Plaintiffs concede that Land Holding is the titular owner of the Spanish Trails property and do not contest that finding.  Notably, this cause of action was necessary because plaintiffs filed a lis pendens, which necessarily requires the recording party to assert a property interest in the real estate.  This Court must issue a judgment declaring that Land Holding is the sole owner of the property and, based upon the other claims, award damages for its lost expectancy.

/ / /

16

IV.    **CONCLUSION**

Defendant The Land Holding Group, Inc. respectfully requests that this Court enter judgment in its favor and against plaintiffs on the three remaining claims in the Complaint.  Counter Claimant The Land Hold Group, Inc. respectfully requests that this Court enter judgment in its favor and against counter defendants Moshe Gedalia, Suzie Gedalia, Isaac Gedalia and M&S Unlimited, LLC in the amount of $4,973,000.  Counter Claimant The Land Holding Group, Inc. is further entitled to an award of exemplary damages in an amount equal to its compensatory damages.

DATED:  December 17, 2009            COHON & POLLAK, LLP


                                     By:    /s/Jeffrey M. Cohon
                                     JEFFREY M. COHON, ESQ.
                                     Attorneys for Defendant and Counter
                                     Complainant, The Land Holding Group, Inc.

**RESPONSE OF DEFENDANT AND COUNTER CLAIMANT THE LAND HOLDING GROUP, INC'S TO PLAINTIFFS' POST TRIAL BRIEF**

# TABLE OF CONTENTS

Page

MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . 2

I.    THE SUBSTANTIVE LAW OF ARIZONA LAW APPLIES TO THIS
      CONTROVERSY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   LAND HOLDING'S RESPONSE TO PLAINTIFF'S ADVERSARY CLAIMS
      AGAINST THE LAND HOLDING GROUP, INC. . . . . . . . . . . . . . . . . . . . . 2

      A.    Plaintiffs Have Not Established a Claim Against The Land Holding Group,
            Inc. For Violation Of The Nevada RICO Statutes. . . . . . . . . . . . . . . 2

            1.    The Burden of Proof Required to Establish a Violation of the
                  Nevada RICO Statutes Is Clear and Convincing . . . . . . . . . . . . 2

            2.    There Is No Aiding And Abetting Liability Under RICO . . . . . . 3

            3.    Plaintiffs Fail To Allege Aiding and Abetting Liability Against Land
                  Holding And Therefore Cannot Make That Claim At Trial. . . . . 4

            4.    Only A Defendant Actually Committing A Recognized RICO
                  Violation Can Be Sued Under The Nevada RICO Statute. . . . . . 5

            5.    Plaintiffs Offer No Analysis Of The Predicate Acts. . . . . . . . . . 7

      B.    Unjust Enrichment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      C.    Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

III.  LAND HOLDING GROUP, INC'S COUNTERCLAIM . . . . . . . . . . . . . . . . 10

      A.    Intentional Interference With Prospective Economic Advantage. . . . . 10

            1.    The Gedalias' Knowledge of the Prospective Relationship . . . 11

            2.    Absence of Justification . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

            3.    The Gedalias Intended To Cause Harm To Land Holding. . . . . 15

      B.    Abuse of Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      C.    Abuse of Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Cohon & Pollak,
LLP

**RESPONSE OF DEFENDANT AND COUNTER CLAIMANT THE LAND HOLDING
GROUP, INC'S TO PLAINTIFFS' POST TRIAL BRIEF**

<u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

*Allum v. Valley Bank of Nevada*

    (1993) 109 Nev. 280 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 5

*Armstrong v. McAlpin*

    699 F.2d 79 (C.A.N.Y. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*Baumer v. Pachl*

    8 F.3d 1341 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Central Bank of Denver v. First Interstate Bank of Denver*

    511 U.S. 162 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 6, 7

*Chanay v. Chittenden*

    (1977) 115 Ariz. 32 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Community Guardian Bank v. Hamlin*

    (1995) 182 Ariz. 627 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Collins v. Texas Co.*

    267 F.2d 257 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Department of Economic Dev. v. Arthur Andersen & Co.*

    924 F.Supp. 449 (S.D.N.Y.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Dick v. United States*

    40 F.2d 609 (8th Cir. 1930) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Enlow v. Salem-Keizer Yellow Cab Co., Inc.*

    389 F.3d 802 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison*

    955 F.Supp. 248 (S.D.N.Y.1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*In Re Fantastik, Inc.*

    49 B.R. 510 (Bkrtcy. Nev. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*In re Lake States Commodities, Inc.*

    936 F.Supp. 1461, 1475 (N.D.Ill.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

19

1   *Johnson v. American National Insurance Co.*

2        (1980) 126 Ariz. 219 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

3   *King v. Deutsche Bank AG*

4        (D.Or. 2005) 2005 WL 611954  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

5   *LTR Stage Lines v. Gray Line Tours*

6        (1990) 106 Nev 283  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

7   *MEI Intern., Inc. v. Schenkers Intern. Forwarders, Inc.*

8        807 F.Supp. 979 (S.D.N.Y. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

9   *Morn v. City of Phoenix*

10        (1986) 152 Ariz. 164 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

11   *Neilson v. Union Bank of California, N.A.*

12        290 F. Supp.2d 1101, 1130 (C.D.Cal. 2003)  . . . . . . . . . . . . . . . . . . . . . . . 4

13   *Nienstedt v. Wetzel*

14        (1982) 133 Ariz. 348  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

15   *NMB Air Operation Corp. v. McEvoy*

16        194 F.3d 1317 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

17   *Oscanyan v. Arms Co.*

18        103 U.S. 261 (1880)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

19   *Reeves v. Ernst & Young*

20        507 U.S. 170, 113 S.Ct.1163, 122L.Ed.2d 525 (1993)  . . . . . . . . . . . . . . . 5

21   *Rhoades v. United Air Lines, Inc.*

22        340 F.2d 481  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

23   *Rolo v. City Investing Co. Liquidating, Trust,*

24        155 F.3d 644 (3rd Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

25   *Siragusa v. Brown*

26        (1998) 114 Nev. 1384 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

27   *United States v. McKeon*

28        738 F.2d 26 (2nd Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Cohon & Pollak, LLP

**RESPONSE OF DEFENDANT AND COUNTER CLAIMANT THE LAND HOLDING GROUP, INC'S TO PLAINTIFFS' POST TRIAL BRIEF**

*Wells Fargo Bank v. Arizona Laborers, Teamsters, Cement Masons*

  *Local No. 395 Pension Trust Fund* (2002) 201 Ariz. 474  . . . . . . . . . . . . . . . 5

*Westways World Travel v. AMR Corp.*

  182 F.Supp.2d 952 (N.D.Cal.2001)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*White v. ARCO/Polymers, Inc*.

  720 F.2d 1391, 1396 (5th Cir. 1983)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Woodward v. Metro Bank of Dallas*

  522 F.2d 84 (5th Cir 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7


## STATUTES

28 *U.S.C.* §§ 1334  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Nevada RICO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Cohon & Pollak,
LLP

**RESPONSE OF DEFENDANT AND COUNTER CLAIMANT THE LAND HOLDING
GROUP, INC'S TO PLAINTIFFS' POST TRIAL BRIEF**